Case No. 17-7033, Triple Up Limited Appellant v. Youku Tudou. Mr. Sandell for the appellant, Mr. Dreyer for the appellee. Good morning. Good morning. Good morning and may it please the Court. My name is Lawrence Sandell on behalf of Appellant Triple Up Limited, or TUL, and I plan to reserve three minutes of my time for rebuttal. As Internet technologies continue to advance, questions regarding what types of electronic contacts with a forum confer personal jurisdiction become more and more complex. On one end of the spectrum, it's clear that merely operating a website that can be accessed in a forum is not purposeful availment. But on the other end, specifically engaging in electronic business transactions with forum residents, such as through an e-commerce website, is purposeful availment. In between, the law is far from settled, and that's where we are here today. So this case presents the Court with the challenge of fitting a particular technological fact pattern, a specific iteration of Internet broadcasting, geotargeting, and geoblocking technologies into this existing spectrum of Internet personal jurisdiction jurisprudence. And this Course is tasked with making the fact-specific determination of whether Youku's electronic contacts with the United States are best characterized as voluntary and deliberate on one hand, or as fortuitous, random, attenuated, or merely the result of another party's unilateral activities on the other. So would you agree that a website host who determines upon receiving a request merely whether it is permissible to allow access in a particular country, that that is mere access as opposed to closer to the transactional phase? So to clarify your question, Your Honor, you're referring to a website that checks to see? I'm referring to your brief and the description of what Youku does. And you're arguing that that should be enough to be affirmative. So I'm taking that and asking you, piecing it. I'm asking whether you agree that if Youku is merely determining whether it may permissibly allow access at a particular location, is that more than merely allowing access? If Youku solely determined access based on the geographical area and determined whether or not it broadcasts based merely on whether or not... That's my question. In that case, yes, we would say it is purposeful availment. If Youku's website, which it does here, makes an election using it as one of the factors, where is this broadcast going to if it considers that? So if that's your position, then why wouldn't that be true in all these other cases? I mean, there are not a lot of cases out there, but the courts have drawn a line between this sort of active business transactions and the type of what I'm going to call geographical inquiry. And yet you want to take the position that the geographical inquiry itself is enough? Yes, Your Honor. If the geographical inquiry is made, in all of these other cases, there was no geographical inquiry made. Whether or not that technology exists is another question. We're not asking for a mandatory geo-blocking regime across the board. What we're specifically asking for here is in specific cases like this case, where the geography is important to the business plan and decisions are made based on the geography, knowing that a certain broadcast will go to the United States as well as directing specific advertisements that are specifically focused on the United States, that is purposefully availing oneself to the United States. Let me ask you a question that I don't know the answer to. This is not one of those I'm posing because I don't know the answer. Is any case law concerning broadcasting in comparable situations? That is to say, a radio station in Mexico just across the Rio Grande that broadcasts into the central United States and has advertisements for plastic stage wets. Is that within the jurisdiction, personal jurisdiction? I vaguely recall that in the Prefix for the District Court, but I can't remember the case. I do note that during preparation for this appeal, I discovered another case that's actually making its way to this court that had dealt with this issue. It wasn't in the briefs, but that was Spansky Enterprises v. Telewizja Polska, and that is available at 222-F-SUP-95, and that dealt with some slightly different facts, but a very similar geoblocking issue. I'm sorry. Is that F-SUP-3rd? F-SUP-3rd, yes. Okay, thank you. So as I understood the answer to my question, if the only thing that's happening upon receiving a request is to determine geographic location, and that would be in order to be sure you're not violating a copyright privilege, how can that be purposeful in availment? Well, Your Honor, it's more than just determining the geographical location. No, my question was if that's all that's being done. I mean, in the hypothetical, that all that's being done is assessing a geographical location. Upon receiving a request. Upon receiving a request. And then determining that either you do or don't have permission. Then we believe that would be because deciding whether or not to broadcast based on that geographical location is making a decision. Do we purposefully avail ourselves of this forum? So I may not understand this, but what I'm trying to understand is the case, the leading case we have is the website's just there, and I want to go on a website, a site. That's not enough. Agreed, Your Honor. So arguably the website owner has made a determination that in my hypothetical I should be able to access its website, and that's all it's done. Why isn't that closer to these cases about mere accessibility is not enough? Well, I feel like the determination that you made in your hypothetical. In order to not violate your copyright, your client's copyright. Yes, Your Honor. But I feel like that act of making a determination. To not violate the law? Well, it's not so much to not violate the law, that you're making a determination of whether or not to broadcast. That's the determination that's being made. And when you consider as a primary factor, the only factor in that is where is this broadcast going to, at that point you're purposefully availing yourself of the forum because you have determined that you want to broadcast there, or conversely you've determined you're not purposely availing yourself because you're saying I'm not going to broadcast there. So when that decision is made, that is a deliberate and voluntary decision. It's not, you know, in the other cases that can be described as more fortuitous, a user just goes on and regardless of where they are, the broadcast may just automatically be set in every single case. And that's fortuitous. I'm thinking about following up on Judge Santel's question, these FCC type cases we have where, you know, I have a small FM station and I can broadcast in one state but not an adjacent state. And so when somebody tries to access my signal in one state, a determination has to be made as to, you know, whether or not that would be a permissible action on my part. In other words, I'm just trying to distinguish between a determination to comply with the law as distinct from an invitation to the requester to engage in some sort of transaction with me other than merely viewing what's on my website. Well, I think I do appreciate the distinction you're making, and it is going to be a fine one here, but, you know, we're not trying to change this law of personal jurisdiction. And I think a distinction can be made once there is that voluntary and deliberate decision being made. A radio station owner... What is that voluntary decision? Voluntary decision to do what? The voluntary decision is to broadcast content, whether copyrighted or not, into a particular forum. If that's all it is, then I have the same question Judge Rogers posed a moment ago. How do you get away from the cases that have said there wasn't enough? Well, this, Your Honor, this is a directed broadcast. We're not talking about the initial contact from the user saying, Hey, can you please send me this video? What we're talking about here is you saying, I know exactly where you are. You are in Washington, D.C. I choose to send you this video in Washington, D.C. I do send you this video in Washington, D.C. And in fact, in addition to that, I will send you an advertisement that you have to watch before watching this video that is specifically directed to the United States. To what extent, then, is not blocking essential to your case? It seemed like in the court below it was not really well resolved how much you were relying on that. Yes, well, we weren't resolving on that. We do not suggest a mandatory geo-blocking regime. Small websites around the world, we don't think that they should have to always check where somebody is located. We are not trying to hinder e-commerce and free speech around the world and upend the World Wide Web. We're not asking the court to do that here today. What we are asking is in these specific cases where a sophisticated entity has a very sophisticated system that makes specific deliberate decisions based on geographical location, that the decisions made by its automated system that it designs, it's responsible for those decisions. That's what we're asking. I am not super great on technology, but tell me if I'm understanding how the system works. Or if I'm not, please do correct me. That unlike a radio broadcast that just goes out there and you can't control who happens to hear it or pick it up, the way this works is, and you've used the word broadcast, this is not just accessing a website, it's the streaming that you're concerned about. That's right. I take it, while it's probably done very fast with computers, an individualized decision at a time when a customer requests or a prospective customer requests information and a decision is made by Google's computer to transmit information to that individual. Through streaming, they keep transmitting it in little, little electronic packs over a prolonged period of time. Is that right? That's correct, Your Honor. Okay. So that would be different than from a radio broadcast just getting picked up somewhere else. There's individualized decisions made each time. Yeah, millions and millions of these individualized decisions being made as to the United States over and over again. And obviously many of them actually do decide to broadcast, and when each decision is made, it broadcasts to that specific individual's computer, and you can know it's exactly where that person is located by virtue of their IP address. And that's the advertising package that they sell to advertisers is that we can tie it and target it to the individual that's accessing? They do tout the relationship with American advertisers, and that's how they're able to really garner that additional value from the U.S. market and exploit that value because it doesn't really help Youku if they're going to send an advertisement about the University of Phoenix to Beijing. They need to know that that is going to the United States, and that is the additional way where that personal development evinces itself because Youku is... So you are saying that broadcasting it in the United States is enough to create jurisdiction? Not exactly, Your Honor. Exactly why aren't you saying that? Purposefully broadcasting to the United States. I don't think too many people accidentally send that signal. It's what they do, but I don't think you'd blame them. What I'm trying to draw the distinction is, Your Honor, between Youku's website as it operates now, which we certainly contend has purposely held itself to the United States, and if the website merely accepted everybody's broadcast requests regardless of where they're requesting them from, and sent them the same ad regardless of where that ad is from. Is there evidence that they don't do this? That they don't accept broadcasts based on... or don't accept transactions based on where people are? Yeah, in certain circumstances they have admitted that they will hinder broadcasts. That's less than relying on their failure to block in order to create jurisdiction when you make that distinction. I don't think so, Your Honor. Your Honor, at a certain point it does come closer. There's an awful lot like it. Well, a lot of it is a matter of perspective. In some ways a failure to block is really deciding to broadcast. That seems really vague. And the fact here is that this decision is being made, and this decision is being made based largely in part on the geographic area of the requester. And Youku knows, based on that, Youku knows that a requester is in the United States, looks at the fact that they're in the United States, decides to send them a broadcast, specifically to that person in the United States, and even adds advertisements directed to the United States that shows that they know that it's in the United States and that they're even exploiting the U.S. advertising market of the United States. So there are many... Having to make that decision is the distinction. It's not the mere broadcast. It's not the mere accessibility. It's the fact that they make this decision knowing exactly where it's going. Well, they do it, I think you said, individualized. Individualized, yes. One at a time, every... In every single instance, they know where it's going. They make that decision whether or not to broadcast, and then they make the decision, well, what's the most appropriate advertisement for someone in this location, and perhaps with certain demographics that they know about. It sounds like somebody affiliated with Triple Up in the United States did this one time, but then there doesn't seem to be any allegation that... There's this vague statement that it's less than 1%, and that could be one person, or that could be a million people. But how do we know that anyone else is doing it other than the one that was done by a Triple Up person? Well, it's our belief that they do, and one thing that we are looking for here is discovery, which we will find out, and very quickly we'll be able to know if these were the instances that we were attempting to use to make our prima facie case of personal jurisdiction. If those were the only instances in existence, well, then our case is not going to last very long. But we need to get to that stage to see what's happening here. But we have established this is the way that their system works, and we're focused solely on this personal jurisdiction issue here. My understanding is that Triple Up acquired the right to these films from another company, Joint Entertainment, something or other, and that their exclusive right actually expires this month? I believe that's correct, Your Honor. In fact, the Squirrel Suicide one expires today. That's the only one I wanted to see. So the other two movies expire November 30th. You don't know if that's been continued or anything? My understanding is actually that Yoku has at this point taken these specific videos down so they can no longer be requested by users, but we're still eligible for damages from this passage in content.  Provided that these videos stay off their website and provided that this right is not renewed, then I would agree with you, Your Honor. Well, to get injunctive relief, you have to show a risk of repetition. Since Joint Entertainment International apparently is the holder of whatever copyright there are, can you get that? Whatever it was you agreed to with them to have this exclusive broadcast right, does that mean you get the damages or do they? Sorry, it's not entirely in the record. I'm not entirely sure what that answer is. I can check. Well, it would be kind of important because if all your rights are expiring within today and the next couple of weeks, you can't have any injunctive relief. If you don't have a right to damages relief, you don't even have standing. Well, I believe the client has a right to pass damages from that period of time. Okay. I can check with my code officer. And it would have to be the statutory damages because you haven't alleged any actual injury, actual damages? I believe it is. It's only actual damages in this case. You asserted statutory damages and actual in the complaint, but I don't know what facts you've alleged that would suggest that there were actual damages from the one download. I believe that for the actual damages, a lot of it will come back and rely on what we discover through discovery. It's been a while since I reviewed the full record from the lower court. Going a little beyond that, I'd like to reserve a little basis for rebuttal. All right, thank you. All right, counsel for Appley. Good morning, Your Honors. Anthony Dreyer, Board Defendant, Appley. Yoku Todu. Let me just address where we ended, Judge Millett. The plaintiffs withdrew their request for statutory damages because they didn't have the requisite copyright registrations. And as counsel noted, once the films were brought to Yoku's attention, they were taken down within 24 hours. They were actually taken down. Does the statute require registration to get the actual damages? Because you're not required to register to have copyright protection under U.S. law. It's a jurisdictional prerequisite, Your Honor. We briefed that below, and they withdrew that request for statutory damages. So it is actual damages that are only in the case. Let me try and put the geo-blocking arguments in a little bit of legal context because I think it's important. As Judge Moss noted, there have only been generally two scenarios where courts have found that Internet contacts were sufficient to establish specific jurisdiction. The first is where the website acts like a virtual storefront, selling products into the forum. That's not this case. That's not argued to be in this case. The other category of cases. Why isn't that this case? Well, because we're not selling products into the territory. We're not selling these videos. Look, this is an online business. It only exists online. All its relationships with customers are online. And what it's selling, you get paid in advertisers, kind of like by commission or some of your store that works by commission or something, but you get paid by advertisers for selling streaming content, for selling them gazillions of little packets of electronic information that go directly to that individual upon that individual's request. Why isn't that like a storefront? Well, if the advertising were at issue, again, because this is specific jurisdiction, if there was a claim about the advertising, that might be enough at least to satisfy the intent prong that the Supreme Court has required under Calder. But there's much more that needs to be required. I don't understand. The advertising is the motivation. That's why they do it. If they're not making money, they're not going to do it. So that's their motive. In fact, they say we are a great opportunity for you advertisers. You should want to use our website. We can help tailor and target your advertising to exactly the people that you want to have hear it. That's the benefit of working with us, and the way we do it is by using this information we're getting from folks when they come to get these videos. It seems to me the advertising is very intertwined. Well, but, Your Honor, that's the case with every website that's commercial. I mean, virtually every website these days uses either pop-up ads or targeted ads or location-based ads. I'm not aware of any single case, and they certainly don't cite any, where mere advertising targeted to the forum in and of itself was a sufficient basis. It's not the mere advertising. It's the combination of, you know, you're the modern-day blockbuster video. The way people come in is they don't physically walk in your door. They come in electronically and say, I would like that video, and I'd like to watch it right now, and you hand it to them in little packets of electronic information over an hour or two to that individual targeted to them, and the way you get paid is this advertising that comes with it. That looks like a storefront exchange to me. Well, but I think the problem is ultimately we have to look at the Calder test. That's the test that the Supreme Court established for tort claims and specific jurisdiction, and there's a four-factor test that they don't even try to meet, as Judge Moss recognized. And your position is this is specific jurisdiction. If it involves that the transaction actually involved here is not one that brings it within the jurisdiction. The transaction with the advertising is for another day. That's correct, Your Honor. If there were a dispute with the University of Phoenix, which, by the way, operates internationally. No, no, no. This is the payment for this transaction. The advertising revenue is the payment for this customer's movie transaction. I don't know how you can. Would they be doing this? Would they be marketing these videos to individuals? Would they offer this product if they weren't getting paid by advertisers? Well, they don't market the videos to anybody in the United States. There's no evidence in the record. I'm not talking about the United States. I'm saying they set up a business model here that says we have all these videos. Come watch them. And the way we get paid, aside from your subscription service, the way we get paid is when you come here, a bell rings, an advertisement goes out, and that's how we get our money. So we just have an extra step in the payment, like a consignment or something. But that's how we get paid. But in each of those types of cases, there's an impact in the targeted form. There's a dispute over that transaction. I didn't get the goods I paid for, or this wasn't what I requested. And so in those cases, there's a commercial dispute over the transaction. There's not a commercial dispute over the transaction. What Tess has been quite used as arises in or relates to for personal jurisdiction. That's what they said in Bristol-Myers. Relates to. So it certainly does seem that it arises out of and it relates to that transaction, and it seems kind of artificial to leave the advertising out of it since it's this package. That's how they do their business. They put them together, and they target. They say, Who are you? Where are you from? And I'm going to pick the advertisement that comes with your video. Well, it's packaged by a third party. So the advertising and the content have nothing in common. It's not like it's attached to the movie. It's provided by a third party. But beyond that, again. Wait, what's provided? The advertisement is created by a third party. The advertisement is created by a third party. It's not for our services. It's for third-party services. And I agree, Your Honor. If there were a dispute over the advertising, if we were engaging in false advertising, or if Triple Up's content were part of our advertising, then the cause of action may actually arise out of the advertising. But as Judge Moss recognized, whatever the content of the ads are makes no impact on the copyright claim. But beyond that, and why I think this case is important, what they're arguing for, what they want this Court to adopt, is effectively a Calder effects test without any effects. Because under Calder, the Supreme Court has said there has to be intentional conduct. It has to be directed towards the forum. It has to cause substantial injury in the forum. And that injury has to be reasonably foreseen. Do you have any VIP clients? They don't even attempt to make an argument. Do you have any VIP clients in the United States? I don't know, Your Honor. But the VIP service is not part of this lawsuit. The VIP service is for premium content. I get that. I'm just asking because there was, I think when asked before, the answer was you didn't have them in D.C. Do you have them in the United States? It's not in the record. Forgive me, Your Honor. It's not in the record, and I'm not aware. But, and again, because it wasn't a focus of this claim, the content that's at issue in this case is not VIP content. It's not paid premium content. What it is, and let me explain how GEOBOC works. Do you have servers in the United States? I'm not aware of any servers in the United States, one way or another. It's not in the record. But Judge Moss noted that even if there were servers in the United States, there's no evidence, legally or factually, that they're jurisdictionally significant. Again, there's not a single case I'm aware of. Well, there's not evidence either way. Right. But there's no cases. They didn't cite any to Judge Moss, that the mere presence of a server would be enough. At most, under Calder, that would show, perhaps, intent to affect the forum. I think they'd also have to show that we put the content on the servers, when, in fact, we believe this was content put on by third parties, and, under Calder, that there has to be a substantial impact in this jurisdiction. And they don't make that argument. They're based in Africa. There's no U.S. copyrights at issue here. They don't have business in the United States. So what they want this court to adopt is a novel jurisdiction theory of Calder-like, Calder effects without any effects in the United States. I want to briefly touch, because I'm running out of time. Let me ask you briefly, and, again, I don't know what the effect of this is, but do you know of any cases involving radio or television broadcast that's considered similar? There's one case I'm thinking of where, and I think the test, and I'd be happy to brief this, Your Honor, and then I'll talk about geoblocking and why this may be a little different. But to answer your question, I think if the contact outside of the territory is incidental, then that doesn't constitute purposeful availment. Let me just briefly address the way geoblocking works. I think that means you don't know of a case either. That's how that incidental transmission to a territory is not infringing. I believe that's right, Your Honor. So the way geoblocking works, to be clear, YOCU does geoblock a portion of the content on its website, and that is specifically licensed content where its agreement with that party requires it to broadcast or to stream the content only in certain territories. So if it licenses Harry Potter to show in China, its license agreement restricts that from being shown anywhere else. So when that file is put on YOCU's server, that file is marked to be shown only in China. There's data that's added to that file. All of the other content on YOCU's website is not geoblocked. So content YOCU posts that it creates, content that it licenses that is not restricted geographically, and content that users put on YOCU's website. None of that is geoblocked. So when anybody in the world tries to access that content, it is sent to wherever they are. And that's how every other Internet site operates. That's how the site in GT operates. There is no true broadcast. An Internet only sends information. An Internet site only sends information when a party requests it. They ping the website with a URL address or with a link to say, I want this content, and the website operator sends that content to wherever the person is in the world. Be that a home page, a video file, a photograph. That's how all websites work. That's how the website in GTE worked. If somebody in D.C. went to that website, Judge Santelli, I know that was your case, I know you're familiar with it, and said, I want the Yellow Book phone listing, that's where the webcasters send it. That's exactly how the website operates here. So is that the same as just accessing information on a website? Streaming is an ongoing interconnection between two computer systems. It goes on for a while with repeated sending of packets of information over the wire or ether, whatever you want to call it. Forgive me for speaking over you, Judge Millett. I think the only difference is that it takes a longer process because the files are longer. But GTE is content agnostic. Personal jurisdiction and due process is content agnostic. What Calder requires. It's not going to be process agnostic. It's going to very much want to look at the nature of the relationship. Otherwise, if we just say if it's on a website it doesn't count, we're coming into a world where so much business is on computers and so many transactions are undertaken that way. And it can't be that none of those will ever count for personal jurisdiction. No, but I think you have to look at the test the Supreme Court gave us, which they don't want you to look at, and that's the Calder test. They don't want you to look at it because there is no effect in this country, substantial or otherwise. There's no foreseeability that there would be this effect for these workers. Why is that? I don't know. So if I know there's do you know how many users there are in the U.S.? I don't know. We keep getting less than 1%, but less than 1%. I mean, 1% would be 48 million people a year. So that's a huge amount of people. I mean, your company is just so big that less than 1% is still pretty small. Well, I think we're dealing with apples and oranges. I think the statement was that there were something like 40 million visits, but that's not necessarily streams. My understanding is it's actually less than half of 1%. It's less than a quarter of a percent that visit. But that may go to general jurisdiction. But it's still a million a month, right? A million a month. So 12 million a year. But I think that might go to something that's not at issue, which is general jurisdiction. That goes to whether we were continually and systematically engaging in activity here. This has to do with these three videos. The only evidence in the record that anybody in this country saw these three videos was plaintiff's counsel. And once they told us about it, even before the lawsuit was brought, they were gone within 24 hours. No, I get that. So the personal jurisdiction interview has to be context with respect to these three specific videos or with respect to your video streaming service? Again, because the claims relate to these three videos, I think the courts have made clear that the causes of action have to arise out of the jurisdictional content. These three videos, not our business as a whole. That would be more for general jurisdiction. And I think the danger here is if you adopt this theory, then any website that has geoblocking for some of its content, and lots of websites have copyrighted content. The Washington Post has copyrighted articles, copyrighted photos, copyrighted video. If they geoblock some of that content, then they're going to be subject to jurisdiction wherever they don't geoblock other content. And that, I think, would shred the due process protections. It would change purposeful availment into purposeful avoidance. So when would it be enough? If we're not going to have a world where Internet transactions are never enough, when would it be? Put aside subscription services. Sure. That's too easy. I think there might be a case where the defendant targeted the targeted jurisdiction, advertised, promoted its services in the targeted jurisdiction. They say that's this case. Okay. I mean, you may do it more in other places, but they say that you know you have a quarter of the lesson, 0.25%, which is still a pretty large number of folks coming, and when they come, you're matching up an advertisement that goes out with that video. And there's explanation on the record here about how that's really what's marketed by Youku is its power to advertise, its ability to tailor to the individual. Well, I think, again, they have to target them for this specific content. I think they have to know this specific content is going into the jurisdiction under Calder. And even if you accept that, even if you – and we don't, but even if you accept that the advertisements were enough, even though there's no evidence that we knew these particular works were going into the jurisdiction, there's still two other Calder factors that they can't meet and don't try to meet. And so the standard they want this Court to adopt is if you know the content is going in there because somebody asked for it and you sent it there, that's enough, and we could ignore the effects portion of the Calder test, which, quite frankly, I think is the most important part of the test. Your conduct has to have a substantial impact in the targeted form. If it doesn't, then there shouldn't be specific jurisdiction. But, Judge Mollett, that doesn't mean every case is now scot-free. If there are instances where a copyright owner is based in the United States or has a substantial portion of its business licensing the work in the United States, they may be able to satisfy the test. I'm not suggesting that every off-seas Internet operator can never be held here. But under these facts, I don't think this is a close question. Judge Mollett certainly didn't think this was a close question. What about standing? So injunctive relief, they just haven't alleged standing for that, and the plea seems to be moot for many reasons. Right. And if they withdrew their statutory damages, and I at least didn't see the complaint alleging any actual harm. Correct. So why do we have an argument for that? We had made an alternate basis below that they'd failed to state a claim for lack of standing, for lack of sufficient evidence that they had these copyright licenses in the first place. Typically, you attach the licenses to show that you have a right to sue. We had similar arguments with respect to their Lanham Act claims, which we think are preempted by the Daystar decision. Judge Moss didn't reach those because he said, I don't have to because there's not enough for specific jurisdiction in this case, which was their only jurisdictional theory. The only thing, and I know I'm late on time, but since counsel addressed discovery, I do want to say it is their burden to show that the discovery they seek would be jurisdictionally significant, that it would support jurisdiction. And all they really did before Judge Moss was give him a laundry list of the requests they were seeking. They didn't cite any case law. They certainly didn't cite any case law that things like a server were sufficient to support jurisdiction. They still don't cite that case law. This isn't an abuse of discretion standard. It's exceptionally deferential, and we don't think Judge Moss abused his discretion in denying discovery. Thank you. All right, counsel for appellant. Thank you. Just to get back to Your Honor's question, I concur with co-counsel that we will see damages for past actions. We're not sure if the license has been renewed at this time, but we will need a discovery for actual damages. Well, wait a minute. You allege the one download that you yourselves did, so you can't really be damaged by that. And that's all. Where do you allege any actual damages in your complaint? Well, I said we will need discovery first. So you can file a complaint without showing any actual damages, any actual injury, and try to get discovery? Don't you have to show actual injury to get into court to have discovery? Yes. I mean, I believe there's actual injury from those three. I recognize it's not as harsh an injury as often. Is it any injury? How is that any actual injury? Well, it's still infringing of the copyrights. It's infringing for you guys to look at your material that you've installed? Well, it's infringing for them to broadcast it. And it's a confirmation that it's sent to you. So if the only one that ever sees it is you, it's still an actual injury? I mean, okay. I understand. Right. I'd like to address and move on to opposing counsel spoke much about Calder. And we have never relied upon the effects test. The district court below actually pointed out that we did not rely on Calder. And the reason for that is this case involves direct actions by Yoku. It's not the effect that was unforeseeable. Indeed, Yoku actually foresaw this very effect. It knew that it may be subject to such copyright infringement lawsuits in the United States. It admitted that in its SEC disclosures. And much unlike, you know, TV or radio, where the next state may receive some sort of incidental signal or incidental broadcast, that was not purposely sent to that next state. In this case, every time it's streaming, it's specifically targeted to an individual. Additionally, we have to point out that third-party participation in the advertisement selection does not undermine the import of the advertisements there. There's no question that Yoku has knowledge and control of the videos and ads that are watched in the U.S. and has approved of such placement, at least, if not having control of it. And I'd refer your honors to the Heroes case, which is cited in the brief for that. I'd also like to, with reference to the alleged distinction between Yoku-uploaded videos and user-uploaded videos, actually, opposing counsel in their briefs conceded that the distinction is irrelevant to this case. But beyond that, there is a factual procedural distinction. How could it be irrelevant if it was third parties that were doing it that they don't control? That would seem to actually weigh in their favor. Whereas if it was Yoku that was doing it, that would weigh in your favor. I'm not entirely sure why they called it irrelevant, but it was something that they had conceded in a footnote in one of their briefs, their reply brief. But I will also point out that there is a factual dispute on this matter, given the indicia that are involved in videos that are user-uploaded having a username and ones that are Yoku-uploaded not having a username. And this factual discrepancy must be resolved in favor of T.U.L. for this motion to dismiss. And finally, there are several points that Your Honor has asked that counsel about regarding the facts of this case. And those are still open questions which are in order to discovery here. So in conclusion, appellant T.U.L. requests this court reverse the lower court's dismissal and find specific jurisdiction under Rule 4K2, and the alternative T.U.L. requests that the dismissal be vacated and T.U.L. be permitted to engage in reasonable discovery. Thank you. We'll take the case under advisement.
judges: Rogers, Millett, Sentelle